IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| SUSAN A. SHARP, | ) |
| Plaintiff, | ) |
| v. | ) CV-96-PT-1665-E |
| ADVANCE STORES COMPANY, INC. d/b/a ADVANCE AUTO PARTS, | ) |
| Defendants. | ) |

**ENTERED MAR 1 9 1997**

## MEMORANDUM OPINION

This cause comes on to be heard on the defendant's Motion for Summary Judgment and Alternative Motion to Limit Relief filed on February 3, 1997.

### BACKGROUND

The plaintiff, Susan Sharp, alleges that the defendant unlawfully discriminated against her because of her gender in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.*, as amended by the Civil Rights Act of 1991. She further alleges that such conduct led to her constructive discharge.

Advance Auto Parts (Advance) hired Sharp on September 28, 1993 as an Assistant Manager in Training (AMIT) at its retail store in Anniston, Alabama.[1] Sharp worked as an AMIT for approximately six months and, during that time, received two performance evaluations. On her first evaluation, administered less than three months after she began work, Sharp received an

---

[1] The defendant's management scheme ascends as follows: Assistant Manager in Training, Assistant Manager, Store Manager, Division Manager, Zone Manager.

1

"Above Average" rating. Approximately two months later, she received an "Average" rating. On March 6, 1994, Advance promoted Sharp to Assistant Manager.[2]

During this time, Stephen Dutton worked as a Parts Specialist, or "Parts Pro," in the Anniston store. In January 1994, Dutton sought and obtained a promotion to AMIT.[3] As an AMIT, Dutton received a performance evaluation rating of "Above Average." Advance promoted Dutton to Assistant Manager after about six months and transferred him to the South Anniston store. His resulting performance earned an overall rating of "Commendable".[4]

In September 1994, Advance promoted Carl Reininger, the Anniston Store Manager, to a Division Manager position.[5] His promotion left the Anniston Store Manager position open. Advance promoted Dutton to this position and transferred him from the South Anniston store back to the Anniston store. Before publicly naming Dutton as Store Manager, however, Division Manager Vickie Weaver contacted Sharp to discuss why Sharp had not received the promotion. Weaver purportedly explained that Sharp's performance weaknesses[6], and Dutton's superior performance, were the bases for the promotion decision.

After learning of the events, Sharp told Weaver that she could not work under Dutton

---

[2] The AMIT position is an hourly-wage job in which Advance limits work hours to forty per week. The Assistant Manager position is salaried and scheduled for at least forty-eight hours per week.

[3] Advance claims that, normally, employees who are experienced in automotive repair and not interested in advancing to management hold the Parts Specialist job. Division Managers must approve any move from the job to management.

[4] Advance claims that a rating of "Commendable" shows superior performance.

[5] Although the record is unclear, Reininger apparently did not replace Weaver as Division Manager over the Anniston stores but assumed the position elsewhere.

[6] On a prior store visit, Weaver purportedly told Sharp that she needed improvement in the administrative areas of task management and delegation.

2

because she felt that she had done Dutton's work for him when he was an AMIT at the Anniston store. Weaver consequently allowed Sharp to transfer to the Jacksonville, Alabama store in August 1994. At the Jacksonville store, Sharp's job performance apparently deteriorated. According to Advance, she continued to have problems with managing multiple tasks and delegating responsibilities. On February 15, 1995, Store Manager Joel Henderson spoke with Sharp about the perceived problems and her needed improvement for consideration as a Store Manager. Either during this conversation or at some other closely related time, Henderson apparently suggested that Sharp pursue another job option that she had. He indicated to Sharp that her promotion opportunities at Advance were slim. On her final evaluation in March 1995, she received ratings of "Below Average" in the areas of Planning Skills, Training/Development Skills, Analytical Ability, Supportiveness, and Leadership. On April 4, 1995, Sharp resigned.

On September 28, 1995, Sharp filed a Charge of Discrimination with the EEOC claiming that she was discriminated against based on her gender and that she was subjected to a sexually hostile working environment at both the Anniston and Jacksonville Advance stores. On March 26, 1996, the EEOC concluded that Sharp's claims relating to incidents at the Anniston store were untimely because she had not filed her Charge within 180 days of the last purported act of discrimination. The EEOC dismissed all other claims because there was sufficient information for it to conclude that further investigation would not likely result in a cause finding. After receiving her right to sue, Sharp filed suit against Advance on June 26, 1996.

## CONTENTIONS

### I. MOTION FOR SUMMARY JUDGMENT

3

### 1. Hostile Environment

Sharp contends that she was subjected to a sexually hostile working environment while at the Anniston and Jacksonville stores. Specifically, she claims that she overheard the Anniston Store Manager Carl Reininger refusing to promote a female cashier because she was "working in a man's world and had better get used to it." Reininger purportedly told another employee that if "she had between her legs what she had on her chest she would be a hell of a man.[7]" He purportedly told still another employee that she needed to be kept barefoot, pregnant, and in the kitchen. Reininger also allegedly told an employee of German descent that the German phrase "guten tag" meant "good and tight," which, he said, describes German women.[8] Sharp contends, moreover, that male employees told sexually explicit jokes and discussed female body parts. All of these actions, she claims, combined to create a sexually hostile environment.

Sharp further contends that she endured similarly hostile treatment while employed at the Jacksonville store. She claims that Store Manager Joel Henderson believed that females had no place in an auto-parts store.[9] As evidence, she asserts that once Henderson told her that "men did not like to buy auto parts from women." Another time, Henderson purportedly forced a female cashier's resignation and then declared that he did not want another female cashier. Still another time, Sharp claims that Henderson told her that if she got pregnant, he could fill her position and

---

[7] Sharp testified, however, that she did not hear this comment when Reininger purportedly made it, but instead learned of it from the other employee.

[8] Sharp testified that Reininger made this statement at least six times in her presence.

[9] Sharp contends that an anti-female atmosphere permeated the Jacksonville store. As evidence, she claims that of fifteen employees during her tenure, eleven were male and four female. Three of the four females were cashiers and only one, Sharp, was in management. She contends that a similar atmosphere existed at the Anniston store. She claims that of the thirteen employees hired when the Anniston store opened, only four were women and, of those, three were cashiers.

she would be "basically just out of luck."

Sharp also contends that Weaver, the female Division Manager, was similarly prone to acting offensively. For example, Sharp claims that Weaver had a practice during store visits of taking management personnel to lunch but, routinely, took only males.[10] She also claims that Weaver bragged about a trip to the restaurant Hooters with other male employees where Weaver apparently made an explicit comparison of her breasts to those of the waitresses.

Advance contends, however, that Sharp's claim relating to purported incidents at the Anniston store is time-barred. The company notes that Sharp transferred from the Anniston store in August 1994 but waited until September 1995 to file an EEOC Charge of Discrimination, more than 180 days later. Despite the purported time-bar, Advance argues that Sharp's allegations do not depict a sexually hostile working environment. The company argues that Sharp has produced insufficient evidence that either Reininger's or Henderson's alleged conduct was so frequent or severe that it interfered with her work and created an abusive environment. Additionally, Advance claims, none of the purported sexual remarks were directed toward Sharp, thus militating against a finding of hostile environment.[11]

In any event, Advance contends that it had no knowledge of the purported harassment because, as Sharp admits, she never reported any problems to higher management. The company claims, moreover, that no evidence exists, other than Sharp's own allegations, showing that it should have been aware of the purported conduct. Advance notes that Sharp neither followed the company's reporting procedure nor called its toll-free complaint hotline.

---

[10] Sharp testified, however, that she went to lunch with Weaver twice.

[11] Further, some proffered evidence is hearsay.

Sharp attempts to avoid the apparent time-bar as to the events at the Anniston store by claiming that the defendant's acts constitute a continuing violation of Title VII. She claims that consistently similar sexual comments by both Reininger and Henderson create a nexus from the discrete violations alleged within the statutory period, events at the Jacksonville store, to those outside the statutory period, events at the Anniston store. In response, Advance contends that the evidence is insufficient to show a series of related acts and instead reveals, at best, isolated and sporadic outbreaks of misconduct. Thus, Advance argues that Sharp has not shown a nexus with her untimely claims and a timely incident of harassment for her to satisfy the continuing violation standard.

### 2. Failure to Promote

Sharp next contends that she was unlawfully denied a promotion based on her gender when Advance named Dutton the Anniston Store Manager instead of her. She claims that, according to Advance's training manual, the Parts Specialist position from which Dutton advanced, is not a management stepping stone. She notes Henderson's testimony in which he stated that the Parts Specialist job was "not designed or intended" to lead to management. As Sharp began her career in management, she argues that she was more deserving of the promotion.

Advance contends, however, that Sharp's promotion claim is also time-barred. The company notes that it promoted Dutton in August 1994 but that Sharp did not file an EEOC charge until September 1995, more than 180 days later. In any event, Advance claims that it promoted Dutton instead of Sharp based on legitimate, nondiscriminatory reasons. Specifically,

Advance argues that Dutton was the best qualified based on his superior job performance.[12] Advance further notes that while a promotion from Parts Specialist to management is unusual, there is no company policy prohibiting it. Such promotions, Advance contends, require only Division Manager approval, which Dutton received.[13]

Sharp contends that Advance's purported reason is pretext for unlawful discrimination. Sharp claims that she often did Dutton's work for him while he socialized, a problem she purportedly complained of to both Reininger and Weaver. She argues, moreover, that Advance taught Dutton to do paperwork while he was a Parts Specialist but failed to teach her while she was an AMIT. Sharp further contends that Weaver promised to send her to the next available management training school, but, instead, sent another male employee. Finally, Sharp contends that male employees, Dutton included, received promotions after spending social time with Weaver. These events, she contends, show that Advance's decision to hire Dutton was based on gender and not on the prextext of superior qualifications.

### 3. Disparate Treatment

Sharp contends that Advance treated her differently than her male counterparts. One example, Sharp claims, is that she sometimes worked twelve hours per week more than her male predecessor, and, on average, four to seven hours more. She also claims that Reininger verbally

---

[12] As an Assistant Manager at the South Anniston store, Dutton purportedly received an overall evaluation rating of "Commendable," with subratings of "Excellent" in three categories. Advance claims that these ratings placed Dutton among the company's superior performers. During the same time, Sharp received an overall rating of "Above Average" with two subratings of "Commendable" and no subratings of "Excellent." Advance contends that these ratings only placed Sharp among the company's satisfactory employees.

[13] Advance also contends that because Weaver, the female Division Manager, was the primary decision maker in Sharp's hiring and promotion to Assistant Manager, a strong inference arises that any subsequent promotion decisions affecting Sharp were not gender-based.

7

reprimanded her for being late but never reprimanded Dutton or other male management for tardiness. Advance contends that Sharp has no evidence of the number of hours that her predecessor worked and, in any event, it requires management to work "48 plus hours a week." Advance further claims that Sharp often worked more than forty-eight hours because of her poor work performance.

Sharp next contends that Advance disciplined her differently than her male counterparts. Specifically, she claims that Advance disciplined her for failing to make a bank deposit when she was Assistant Manager of the Anniston store, but that Henderson was not disciplined when he left town with the bank bag keys. Advance contends that Sharp and Henderson had different supervisors, that Henderson was unaware that he had taken the keys, and that they did not engage in the same conduct. Accordingly, Advance claims, the two individuals were not similarly situated in all respects and a disparate treatment claim must therefore fail.

Sharp further claims disparate treatment because Weaver promised to place her in a management training class, but, instead, selected another male. She also claims that Weaver took males to lunch to the exclusion of women. Finally, she clams that two male assistant managers made more money than she and that one of those male managers did not have to clean the store as did she.[14] Advance disputes the merits of these contentions and argues that Sharp has taken a shotgun approach to this litigation by asserting that any purported difference between her and a male counterpart was gender based.

### 4. Constructive Discharge

Sharp contends that, as a result of the treatment she purportedly endured and Henderson's

---

[14] Sharp has not submitted any evidence to support her allegation of unequal pay.

8

suggestion that Advance might demote her to an AMIT position, she felt compelled to resign. She claims, moreover, that rumors circulated regarding her potential demotion. In further light of the fact that Advance awarded all promotions to males during her tenure, Sharp felt that her working conditions were so difficult and unpleasant that any reasonable person would have felt compelled to quit.

Advance claims that such comments, even if made, do not rise to an intolerable level. Advance contends that the mere fact that Sharp was receiving purportedly critical evaluations and forewarning of the potential consequences from her supervisor would not have forced a reasonable employee to resign. Moreover, it contends, an employee has an obligation to act reasonably and not to assume the worst or jump to conclusions too fast.

## II. ALTERNATIVE MOTION TO LIMIT RELIEF

In the event the court does not grant summary judgment, Advance has asked this court to limit the relief sought by Sharp. Specifically, Advance claims that Sharp is not entitled to front pay or back pay because she has failed to satisfy her statutory duty to mitigate her damages. Advance argues that Sharp has applied for and held only one job since she resigned from Advance and that she held that job for less than two months before resigning. Since then, Advance contends, Sharp has claimed to work at her father-in-law's book bindery. Advance argues, however, that while Sharp is officially on the payroll, she has no job title and may not work for up to six months at a time. Advance contends, therefore, that Sharp has not attempted to limit her losses by reasonably seeking other suitable employment.

Sharp contends, however, that she has worked since Advance constructively discharged

her. First, she claims, she worked at Farmer's Furniture for approximately six weeks to two months. Since then, Sharp claims that she has worked at her father-in-law's book bindery. She notes that she is on the payroll, and although she does not work full time, she is in charge of "run[ning] the place" when there.

Advance further asks the court to strike Sharp's request for punitive damages under her Title VII hostile environment claim. Advance notes that it has a sexual harassment policy and an extensive sexual harassment reporting procedure that Sharp was aware of, but failed to use. Moreover, Advance argues, Sharp failed to report the purported unlawful conduct to anyone in higher management and cannot present any evidence that Advance knew or should have known of the purported conduct. Sharp argues, however, that the record has sufficient examples that the conduct complained of was so pervasive to have put the defendant on notice.

## LEGAL STANDARD

On a motion for summary judgment, the court must assess the proof to see whether there is a genuine need for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of

10

material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exists a genuine issue for trial. Celotex, 477 U.S. at 324. The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . " in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In making the determination of whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

Considering the above, this court must examine the evidence to decide if there exists a genuine issue of material fact.

## ANALYSIS

### I. STATUTE OF LIMITATIONS

To be actionable under Title VII, a discriminatory act must occur within 180 days of the filing of an EEOC Charge of Discrimination. Events occurring before the 180-day filing period are barred, unless the 180-day period is equitably tolled or the prior acts are elements of a continuing violation. See Beavers v. American Cast Iron Pipe Co., 975 F.2d 792 (11th

Cir. 1992). Sharp urges this court to hold that the prior acts of discrimination committed by Advance are part of a continuing violation and are thus within the 180-day filing period.

To prove a continuing violation, the plaintiff must show that the acts complained of are part of a pattern or policy of discrimination maintained against the plaintiff as of at least 180 days before the filing on an EEOC charge. The perpetuation of the effect of a previous act of discrimination committed outside the filing period, however, does not lead to a continuing violation. United Airlines v. Evans, 431 U.S. 553, 558 (1983). Nor does an unconnected string of discrete discriminatory acts against the plaintiff form a continuing violation. See Beavers v. American Cast Iron Pipe Company, 975 F.2d 792, 796 (11th Cir. 1992). Whether discriminatory acts form a continuing violation of Title VII is a finding of fact. Calloway v. Partners National Health Plans, 986 F.2d 446, 448 (11th Cir. 1993). Of course, as always, if there is no reasonable factual inference, the court must decide the issue as one of law.

This court must decide whether Sharp's claims alleging a hostile working environment, failure to promote, and disparate impact while in the Anniston store were part of a continuing violation. Sharp apparently concludes that one violation of any sort is sufficient to ground all of her continuing violation claims, while Advance assumes that facts supporting each claim must come within the 180-day period.

The relevance of the pre-180 day claims to the discriminatory act within the 180-day filing period decides whether the plaintiff can attach those other claims as part of a continuing violation. Consequently, a plaintiff may possibly include every past act of discrimination against her as part of a continuing violation, depending upon the relationship of the acts to a

common core of discriminatory motive.

The case of Knight v. Columbus, Ga., 19 F.3d 579, 580-81 (11th Cir. 1994), cert. denied, 115 S. Ct. 318 (1994), states the continuing violation standard as follows:

> A past act of discrimination for which a party did not file a charge of discrimination with the EEOC within the limitations period is legally equivalent to a discriminatory act that occurred before the enactment of Title VII. Although such a past discriminatory act may continue to affect an employee's present pay and fringe benefits, such an effect does not constitute a continuing violation of Title VII. . . . [T]he critical question is whether any present violation exists. . . . [W]here the employer engaged in a discrete act of discrimination [outside the limitations period], allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the [statute of limitations].
>
> Gonzalez, 610 F.2d at 249 (citations omitted). The critical distinction in the continuing violation analysis, therefore, is whether the plaintiffs complain of "'the present consequence of a one time violation, which does not extend the limitations period, [or] the continuation of that violation into the present, which does.'" Calloway v. Partners Nat'l Health Plans, 986 F.2d 446, 448 (11th Cir. 1993) (quoting Beavers [v. ACIPCO], 975 F.2d at 796); see also Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 658 (11th Cir. 1993). Where a continuing violation is found, the plaintiffs can recover for any violations for which the statute of limitations has not expired. Beavers, 975 F.2d at 796.

This court will not rule that a plaintiff can resurrect statutorily barred claims by simply alleging a continuing violation theory. Instead, courts adopted the theory to allow claims to continually accrue, for limitations purposes, although the first of the defendant's acts was either before the passage of the applicable statute or after some earlier time barred act. Otherwise, a plaintiff who initially had a claim in 1974 could wait until 1994, if the same situation continued, and sue for an entire twenty year period. Such a result would be inconsistent with the Knight holding and common sense. While a promptly asserted claim can proceed, stale claims should not be revived. This latter conclusion is consistent with the

Knight[15] holding and is particularly appropriate under these facts since Sharp knew, or should have known, of the discriminatory nature of her employer's acts at the time they occurred. In Roberts v. Gadsden Memorial Hospital, 850 F.2d 1549, (11th Cir. 1988), the court held:

> [U]nless the 1978 incident constituted a continuing violation, [the plaintiff's] claim for relief stemming from the 1978 incident was time-barred and the District Court erred in granting relief on the basis of that claim. Here, even if we assume that the 1978 discriminatory act continued into the statutory filing period, we must still conclude that [the plaintiff's] claim based on the incident is time-barred. [The plaintiff] admitted that he was aware of his rights in 1978. He could have asserted them at that time. To the extent that [the defendant] injured him on a continuing basis as a result of the 1978 incident, it was only because he knowingly failed to exercise his rights. A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period.

Roberts, 850 F.2d at 1550 (citations omitted).

The continuing violation theory is particularly inappropriate here because the purported violations in Anniston are attributed to Reininger and those in the Jacksonville store to Henderson. The continuing violation theory does not create an electrical arc type leap between supervisory gaps. The Anniston store complaints are time-barred. The promotion claim with reference to the Anniston store is particularly discrete.[16]

## II. TITLE VII CLAIMS

---

[15] See also Delaware State College v. Ricks, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed.2d 431 (1980); Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Ross v. Buckeye Cellulose Corp., 980 F.2d 648 (11th Cir. 1993); Beavers v. American Cast Iron Pipe Co., 975 F.2d 792 (11th Cir. 1992).

[16] While there are significant issues as to merit relating to the Anniston store complaints, the court does not reach them.

Title VII creates liability when an employer "discriminate[s] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex . . . ." 42 U.S.C. §2000e-2(a)(1); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 63, 106 S. Ct. 2399, 2405-06, 91 L. Ed.2d 49 (1986).

### A. Hostile Environment Sexual Discrimination

To establish a prima facie case of hostile environment sexual harassment, an employer must prove the following: (1) that the employer belongs to a protected group, (2) that the employee was subject to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, (4) that the harassment complained of affected a term, condition, or privilege of employment in that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1557 (11th Cir. 1987). To decide whether a work environment is abusive or hostile, the totality of the circumstances must be considered. Faragher v. City of Boca Raton, 76 F.3d 1155, 1162 (11th Cir. 1996). "Relevant circumstances include: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher, 76 F.3d at 1162 (quoting Harris v. Forklift Systems, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed.2d 295 (1993)).

Title VII plaintiffs who seek to hold their employer liable for hostile environment sexual harassment must generally show that the employer is indirectly liable for the supervisor or co-worker's conduct under the theory of respondeat superior. In rare cases, the employer may be directly liable. Consequently, the plaintiff may show either that: (1) her employer

knew or should have known of the harassment in question and failed to take prompt remedial action,[17] or (2) the harasser acted as the employer's agent. Faragher v. City of Boca Raton, 76 F.3d 1155 (11th Cir. 1996).[18] Only in an exceptional case, however, will the harasser act as the employer's agent in creating a hostile work environment. Faragher, 76 F.3d at 1164.[19]

While the plaintiff must show that she was subject to unwelcome sexual harassment, she is not required to have actively expressed her disapproval towards the unwelcome conduct. The conduct instead must be "unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982). Plaintiff must also show that but for her sex, she would not have been subjected to sexual harassment. Henson, 682 F.2d at 904, and that the harassment complained of affected a "term, condition, or privilege" of the plaintiffs' employment. The court concludes that there is no reasonable inference that the alleged conduct, particularly in Jacksonville, was severe or that it affected a term, condition, or privilege of employment.

In addition, there is no evidence that Sharp reported the alleged conduct to anyone in Advance's "higher management." See Kilgore v. Thompson & Brock Management, Inc., 93

---

[17] The employee can demonstrate the employer's knowledge of the harassment by: (1) showing that she complained of the harassment to higher management, or (2) showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge. Henson v. City of Dundee, 682 F.2d 897, 905 (11th Cir. 1982).

[18] "Strict liability is illogical in a pure hostile environment setting. In a hostile environment case, no quid pro quo exists. The supervisor does not act as the company; the supervisor acts outside 'the scope of actual or apparent authority to hire, fire, discipline, or promote.'" Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir. 1989).

[19] In so-called "direct liability," several nondispositive factors are relevant to whether a harasser is acting as the employer's agent in creating a hostile work environment: the supervisor's direct authority over the plaintiff, the overall structure of the workplace, and the relative positions of the parties. Faragher, 76 F.3d at 1165.

F.3d 752 (11th Cir. 1996). Further, the alleged conduct was no so pervasive as to put higher management on notice or that it knew of the alleged conduct. The Eleventh Circuit recently reiterated that "a court must evaluate the totality of the circumstances both in determining whether the work environment was abusive and in determining whether the conduct was pervasive enough to put the employer on notice." Faragher v. City of Boca Raton, 76 F.3d 1155, 1167 (11th Cir. 1996). An important distinction remains, however, between the question of an employer's notice and the question of the environment's abusiveness. Faragher, 76 F.3d at 1167. A district court clearly errs in finding that the employer's knowledge may be inferred solely from the fact that the conduct was pervasive enough to create an abusive work environment. Id. This court cannot conclude, therefore, that Advance should have known of the alleged behavior even if the court were to conclude that the plaintiff worked in a hostile environment. The court concludes that the alleged conduct was not so pervasive that Advance should have known about it. The alleged acts were all isolated and discrete incidences in that no one, other than the plaintiff, verify their existence as to the plaintiff. The sexually harassing behaviors described in the record are not so pervasive to have necessarily attracted the notice of Advance's management. It is not asking too much to require that a person allegedly being harassed report the harassment to higher management. It is not sufficient for an employee to wait until she receives a low evaluation and then, for the first time, complain of alleged improper conduct. Any reasonable employee would know that she had a right to complain. Accordingly, summary judgment will be granted on this claim.

In any event, the purported conduct falls far short of being so "intolerable" that it supports a constructive discharge claim. See Kilgore, supra. Sharp's general allegations of

17

disparate treatment likewise lack merit. She has not rebutted the defendant's articulated reasons.

This __19__ day of March 1997.

_____
Robert B. Propst
Senior United States District Judge

18